**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
T:  (212) 940-8800
F:  (212) 940-8776

*Attorneys for Plaintiffs Kevin Heneghan,*
*Ira Leventhal, Lookout Dove Partners LP,*
*and Catherine Heneghan Revocable Trust*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN HENEGHAN, an individual, IRA LEVENTHAL, an individual, LOOKOUT DOVE PARTNERS LP, a limited partnership, and CATHERINE HENEGHAN REVOCABLE TRUST, a trust,<br><br>      Plaintiffs,<br><br>  v.<br><br>DANIEL THIBEAULT, an individual, GRADUATE LEVERAGE, LLC, a Massachusetts limited liability company, GL CAPITAL PARTNERS, LLC, a Massachusetts limited liability company, and TAFT FINANCIAL SERVICES, LLC, a South Dakota limited liability company,<br><br>      Defendants. | Civil Action No.:<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

  Plaintiffs Kevin Heneghan, Ira Leventhal, Lookout Dove Partners LP, and Catherine Heneghan Revocable Trust (collectively, "Plaintiffs") by and through their undersigned counsel, for their Complaint against Defendants Daniel Thibeault ("Thibeault"), Graduate Leverage, LLC ("Graduate Leverage"), GL Capital Partners, LLC ("Capital Partners"), and Taft Financial Services, LLC ("Taft," and, together with Thibeault, Graduate Leverage, and Capital Partners, "Defendants"), allege and aver as follows:

## NATURE OF THE ACTION

1. This securities action is brought pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act"), Section 15 of the Securities Act, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5, Section 20(a) of the Exchange Act, and the Massachusetts Uniform Securities Act. Plaintiffs acquired shares in GL Beyond Income Fund (the "Fund") pursuant to the Fund's registration statement, prospectus, and closed-end fund registration statement amendments and Plaintiffs were damaged thereby.

## THE PARTIES

2. Defendant Daniel Thibeault is a resident of the Commonwealth of Massachusetts residing at 72 Carter Drive, Framingham, Massachusetts 01701. Upon information and belief, Thibeault is the founder and holds a direct or indirect majority ownership interest in Capital Partners, Graduate Leverage, and Taft. From February 22, 2013 until December 17, 2014, Thibeault also served as an interested trustee, chairman, and president of the Fund. Thibeault served as co-portfolio manager of the Fund from March 23, 2012 to December 12, 2012, and then again from February 22, 2013 to December 17, 2014.

3. Defendant Graduate Leverage is a Massachusetts limited liability company that was founded by Thibeault in 2003 and, upon information and belief, is majority-owned by Thibeault. Upon information and belief, Graduate Leverage holds a majority ownership interest in and is the managing member of Capital Partners. Commencing on or about January 26, 2012 and up through the present, Graduate Leverage has served as the servicer for the loan portfolio held by the Fund.

4. Defendant Capital Partners is a Massachusetts limited liability company that, upon information and belief, is majority-owned and controlled by Graduate Leverage. From

January 17, 2012 until December 17, 2014, Capital Partners acted as the sole investment manager of the Fund pursuant to a Management Agreement between Capital Partners and the Fund dated January 17, 2012.

5.     Defendant Taft is, upon information and belief, a special purpose limited liability company formed under the laws of the state of South Dakota in December 2011 with a principal place of business in Massachusetts.  Upon information and belief, Thibeault controls Taft.

6.     Plaintiff Kevin Heneghan is a resident of the state of New York

7.     Plaintiff Ira Leventhal is a resident of the state of New York.

8.     Plaintiff Lookout Dove Partners LP is a Delaware limited partnership headquartered in New York.

9.     Plaintiff Catherine Heneghan Revocable Trust is a trust headquartered in New York.

10.    Plaintiffs invested in excess of $13,500,000 in the Fund.

## JURISDICTION

11.    Jurisdiction is conferred pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa.  The federal securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, SEC Rule 10b-5, and Sections 11 and 15 of the Securities Act.

12.    Venue is proper in this District pursuant to 15 U.S.C. § 77v and 15 U.S.C. § 78aa. The sales and transactions that resulted from Defendants' false and misleading statements took place in New York, where Plaintiffs' primary offices are located.

## FACTUAL BACKGROUND

13.    Graduate Leverage was initially formed to assist graduate students in obtaining loans to finance their educations on more favorable terms than the students would have been able to obtain by themselves.  Graduate Leverage suffered financial setbacks in the late 2000s,

3

however, as the result of legal and regulatory changes that altered the market for graduate student lending and ultimately forced the company to abandon its initial business model.  As Graduate Leverage's legacy business dried up, Thibeault caused Graduate Leverage to diversify into a variety of ventures related to assisting graduate students and young professionals in obtaining financing and investment services.  Among other things, Graduate Leverage, through affiliates and related entities, ultimately launched a fee-based financial advisory business, an insurance brokerage business, and an asset management business.  In October 2011, Thibeault sponsored the formation of the Fund as a Delaware statutory trust.

14.     In early 2012, the Fund opened for business as a closed-end interval fund open only to clients of GL Services, LLC, a financial advisory service and affiliate of Graduate Leverage also operated by Thibeault.  As a closed-end fund, the Fund filed its initial registration statement and prospectus on October 18, 2011, and periodically amended it by filing form N-2s with the SEC.  On or about July 15, 2014, the Fund was opened to investment by the general public.

15.     Since its inception, the Fund's stated investment strategy has been to produce income for its investors by investing primarily in individual promissory notes signed by post-graduate and professional students obtaining, or borrowers that have recently obtained, advanced degrees in areas such as medicine, dentistry, law, veterinary medicine, and business in exchange for loans.  The Fund never invested in securities backed by pools of student loans, but only in individual loans themselves.  The Fund acquired promissory notes in both the secondary market and through direct originations with individual borrowers.

16.     In order to provide for management of the Fund, on January 17, 2012, the Fund, through its former president, Michael Tassone, executed a Management Agreement with Capital Partners appointing Capital Partners the sole investment manager of the Fund.

17.     Among other provisions, Section 2 of the Management Agreement provides that Capital Partners shall determine the securities to be purchased by the Fund, "subject always to the Fund's investment objective, policies and restrictions, as each of the same shall be from time to time in effect, and subject further to such policies and instructions as the Board may from time to time establish."

18.     Section 15 of the Management Agreement provides as follows:

> In compliance with the requirements of Rule 31a-3 under the [Investment Company Act of 1940 ("Act")], you agree that all record[s] which you maintain for the [Fund] are the property of the [Fund] and you agree to surrender promptly to the [Fund] such records upon the [Fund's] request. You further agree to preserve for the periods prescribed by Rule 31a-2 under the Act all records which you maintain for the [Fund] that are required to be maintained by Rule 31a-1 under the Act.

19.     In exchange for the management services provided thereunder, Exhibit A to the Management Agreement specifies that Capital Partners is to be paid an annual rate of 2.25 percent of the Fund's average daily net assets on a monthly basis.

20.     As contemplated in the Management Agreement, Capital Partners acted as the Fund's investment manager and advisor from the Fund's opening in January 2012 until it was terminated on December 17, 2014.  In exchange for its management and advisory services, Capital Partners earned management fees from the Fund totaling $58,400 in the partial fiscal year ending January 31, 2013, and $463,184 in the fiscal year ended January 31, 2014, as well as amounts to be determined after January 31, 2014.  Capital Partners deferred all of its fiscal year 2013 fee and $205,497 of its fiscal year 2014 fee, subject to recoupment under various terms, pursuant to expense limitation agreements between Capital Partners and the Fund.

21. In order to provide for servicing of the student loans held in the Fund's portfolio, on January 26, 2012, the Fund, through its then-president, Michael Tassone, executed a Loan Servicing Agreement ("Servicing Agreement") with Graduate Leverage. Thibeault executed the Servicing Agreement on behalf of Graduate Leverage.

22. Among other provisions, the Servicing Agreement made Graduate Leverage responsible for the maintenance of loan-related documents and records. In Section 3.8 of the Servicing Agreement, Graduate Leverage also agreed to "treat all payments, collections, and other monies received in respect of the Program Loans as trust funds of [the Fund]."

23. During all relevant times, all activities of Capital Partners and Graduate Leverage were run out of the companies' shared office in Waltham, Massachusetts and out of a separate office in the Philippines.

24. During all relevant times, Thibeault controlled Capital Partners and Graduate Leverage and directed their day-to-day activities out of the Waltham, Massachusetts office.

25. Upon information and belief, Graduate Leverage was financially successful in the first several years of its existence.

26. Upon information and belief, starting in approximately 2009, Graduate Leverage—which has over 20 employees in Waltham, Massachusetts and over 90 employees in the Philippines—was no longer profitable and began losing money.

27. Upon information and belief, starting at the latest in 2013, in order to continue funding his failing financial advisory business, Thibeault effected a scheme of creating fictitious loans issued by the Fund that, rather than being paid to bona fide borrowers, were instead transferred by a special purpose entity, Taft, that Thibeault created for purposes of carrying out his fraudulent scheme, into bank accounts controlled by Graduate Leverage.

28.     To cover up his actions, Thibeault then prepared forged promissory notes in the names of real individuals who had never requested nor been provided a loan by the Fund. Thibeault made periodic interest payments on some of the fraudulent loans to give the appearance that the borrowers were current on the loans. Upon information and belief, these "interest payments" were made from a portion of the very monies that Thibeault had diverted from the Fund. Eventually, Thibeault also represented that some of the fraudulent loans were "in deferment" to justify the lack of "interest payments" on them.

29.     Starting at the latest in 2013, Thibeault and his co-portfolio manager informally divided management of the Fund's assets, with Thibeault responsible for managing loans that recently comprised approximately thirty-five percent of the Fund's assets.

30.     Each loan in the Fund was assigned a unique number and letter code that identified the borrower and loan type. Upon information and belief, Thibeault was responsible for loans having the program code "TA," which stood for "Taft."

31.     Typically, for loans originated by the Fund, the Fund directed its custodian bank to wire the money to a transactional bank that formally issued the loan to the borrower. The custodian bank then received a copy of the promissory note signed by the borrower from the transactional bank.

32.     In the case of loans with the program code "TA," however, Thibeault directed the custodian bank to wire the loan proceeds to Taft, rather than another transactional bank. From Taft, the loan proceeds were then wired not to individual borrowers, but instead to a Graduate Leverage-controlled bank account.

33.     For the "TA" loans, Graduate Leverage failed to provide the custodian bank with the promissory notes purportedly issued in 2013 until January 2014—several months after the

loans had purportedly been issued. Upon information and belief, the custodian bank has also never received promissory notes for "TA"-coded loans held by the Fund that were purportedly issued after January 2014.

34. Each of the "TA"-coded loans was also significantly greater in amount than the typical loan originated by the Fund, and the listed principal for most "TA" loans is between $300,000 and $500,000. Further, the identities of the purported borrowers for the "TA" loans are largely friends and known associates of Thibeault.

35. In all, the combined value of the "TA" loans was approximately $15-16 million, or approximately one-third of the Fund's total stated value.

36. Even though Graduate Leverage's loan servicing staff includes individuals dedicated to counseling delinquent borrowers, Thibeault instructed his staff that he would handle the "TA" loans personally.

37. In or about July 2014, despite Thibeault's instructions to the contrary, Graduate Leverage's staff inadvertently sent a loan statement to a former college roommate of Thibeault that was listed as having a loan with a principal balance of approximately $342,000. The promissory note for the loan at issue purported to have been electronically signed by the former college roommate.

38. Upon information and belief, when the former college roommate's accountant contacted Graduate Leverage, Thibeault told the accountant that his former college roommate should "not worry about" the purported loan.

39. Upon information and belief, FBI agents interviewed the former college roommate, who stated that he never conducted business with, obtained a loan from, or borrowed money from Thibeault and that he had never heard of Taft or the Fund.

8

40. Upon information and belief, most, if not all, of the "TA"-coded loans were fraudulently procured from the Fund by Thibeault through the use of forged promissory notes.

41. Upon information and belief, Thibeault then caused the loan proceeds for each of the "TA"-coded loans to be diverted, through Taft, into the bank accounts of Graduate Leverage. The total stated principal value of these loans (and thus the amount presumably diverted by Thibeault) is approximately $15-16 million.

42. Thibeault misrepresented each of the "TA"-coded loans as bona fide loans to Plaintiffs in numerous Fund documents and reports, including materials prepared and distributed to the Independent Trustees for their periodic meetings, quarterly reports, and semiannual reports, as well as on the Fund's 2014 annual report filed with the Securities and Exchange Commission, which Thibeault signed as the Fund's president.

43. On May 29, 2013, the Fund filed a Form N-2 with the SEC, which is false and misleading in almost its entirety because, as described above, the Fund's entire business model was predicated on a sham. Such false and misleading statements include, without limitation:

   a. Statements that the Fund "invest[ed] primarily in individual variable-rate interest income-producing debt securities" when in fact no such debt securities existed, and the "returns" were being paid out of the investors' own investments;

   b. Statements that the Fund Adviser "selects those securities or borrowers expected to produce the highest level of income, subject to a low expected default rate" when in fact the "securities" and "borrowers" were fictitious, not intended to generate any income for the investors, and merely part of the Defendants' scheme to enrich themselves;

44. The May 29, 2013 Form N-2, filed pursuant to the Securities Act, was signed by Thibeault.

45.     On June 2, 2014, the Fund filed a Form N-2 with the SEC, which is false and misleading in almost its entirety because, as described above, the Fund's entire business model was predicated on a sham.  Such false and misleading statements include, without limitation:

   a.     Statements that the Fund "invest[ed] primarily in individual variable-rate interest income-producing debt securities" when in fact no such debt securities existed, and the "returns" were being paid out of the investors' own investments;

   b.     Statements that the Fund Adviser "selects those securities or borrowers expected to produce the highest level of income, subject to a low expected default rate" when in fact the "securities" and "borrowers" were fictitious, not intended to generate any income for the investors, and merely part of the Defendants' scheme to enrich themselves.

46.     The June 2, 2014 Form N-2, filed pursuant to the Securities Act, was signed by Thibeault.

47.     On December 11, 2014, the United States Attorney for the District of Massachusetts filed a criminal complaint against Thibeault in the United States District Court for the District of Massachusetts, alleging one count of securities fraud in violation of 15 U.S.C. §§ 78(b) and 78ff based upon the illegal conduct described above.  The criminal case is captioned as *United States of America v. Daniel Thibeault*, Case No. 1:14-mj-06121-MPK (D. Mass filed Dec. 11, 2014).

48.     After the disclosure Defendants' fraud, the Fund was closed and the value of its shared dropped precipitously.  Plaintiffs suffered extraordinary losses and damage as a result of above.

## COUNT I
**(Thibeault Liability under Section 11 of the Securities Act of 1933)**

49. Plaintiffs incorporate by reference paragraphs 1 through 48, above, as if fully set forth herein.

50. Plaintiffs purchased shares in the Fund pursuant and/or traceable to the Registration Statements.

51. The Registration Statements did not satisfy the disclosure requirements of Section 11.

52. Thibeault is statutorily liable under Section 11(a)(2) of the Securities Act, as a director of the issuer at the time of the filing of the Registration Statements.

53. Thibeault did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

54. By virtue of the foregoing, Plaintiffs have been damaged, and Thibeault is liable for such damages.

55. This action has been brought within one year after the discovery of the disclosure violations or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT II
**(Thibeault, Graduate Leverage, and Capital Partners Liability under Section 15 of the Securities Act of 1933)**

56. Plaintiffs incorporate by reference paragraphs 1 through 55 above as if fully set forth herein.

57. Thibeault was a control person of the Fund by virtue of, among other things, his positions as founder, portfolio manager, and a trustee of the Fund and as a control person of

Capital Partners and Graduate Leverage.  Capital Partners was a control person of the Fund by virtue of being the Fund's sole investment manager.  Upon information and belief, Graduate Leverage was a control person of the Fund by virtue of its majority control of Capital Partners.

58. Each of Thibeault, Graduate Leverage, and Capital Partners are liable as control persons of the Fund for the material misrepresentations made in the Fund's Form N-2s filed with the SEC on May 29, 2013 and June 2, 2014 and in the offer and sale of shares made pursuant to the Fund's corresponding prospectuses.

59. As a direct and proximate result of the wrongful conduct of Thibeault, Graduate Leverage, and Capital Partners, Plaintiffs suffered substantial damages.

## COUNT III
**(For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against All Defendants)**

60. Plaintiffs incorporate by reference paragraphs 1 through 59 above as if fully set forth herein.

61. At all times relevant, the Defendants carried out a plan, scheme and course of conduct which was intended to and in fact did:  (1) deceive the investing public, including Plaintiffs, as alleged herein; and (2) cause Plaintiffs to purchase Fund shares at artificially inflated prices.

62. In furtherance of this unlawful scheme, plan and course of conduct, the each of the Defendants took the actions set forth herein.

63. At all times relevant, the Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64. The Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated a fraud or deceit upon Plaintiffs and the other purchasers of the Fund's shares.

65. Plaintiffs have suffered damages in that, in reliance on the integrity of the market and the accuracy of Defendants' representations regarding the financial information and valuation of the Fund, they paid artificially inflated prices for the Fund's shares, which subsequently declined in value as a result of the revelation of the misrepresentations and omissions alleged herein.  Plaintiffs would not have purchased the Fund's shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants.

66. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Fund's shares.

## COUNT IV
**(For Violations of Section 20(a) of the Exchange Act of 1934 Against Thibeault, Graduate Leverage and Capital Partners)**

67. Plaintiffs incorporate by reference paragraphs 1 through 65, above, as if fully set forth herein.

68. Thibeault, Graduate Leverage, and Capital Partners all culpably participated in the fraud alleged above and were control persons of the Fund by virtue of Thibeault's positions with Fund and each of Graduate Leverage and Capital Partners.

69. As a direct and proximate result of the wrongful conduct of Thibeault, Plaintiffs suffered substantial damages.

## COUNT V
**(For Violations of the Massachusetts General Laws, Chapter 110A, Section 410 Against Thibeault, Graduate Leverage, and Capital Partners)**

70. Plaintiffs incorporate by reference paragraphs 1 through 68, above, as if fully set forth herein.

71. The Fund's securities were offered or sold by means of the untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made not misleading in the Registration Statements.

72. Each of Thibeault, Graduate Leverage, and Capital Partners was a controlling person, partner, officer, director, person occupying a similar status, or employee materially aiding in the sale of securities, of the Fund. By his position of authority, Thibeault, Graduate Leverage, and Capital Partners had the power and authority to influence and control, and influenced and controlled, the decision-making and activities of the Fund and thus materially aided caused it to engage in the wrongful conduct described. Thibeault, Graduate Leverage, and Capital Partners thus materially aided in the sales of the fraudulent securities.

73. Plaintiffs purchased or otherwise acquired shares of the Fund pursuant to the defective Registration Statements. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Fund's solicitation materials. Plaintiffs have been damaged as a result of their purchase of shares in the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and jointly and severally against Defendants Thibeault, Capital Partners, Graduate Leverage, and Taft:

A. Awarding Plaintiffs damages in an amount to be proven at trial;

B. Awarding Plaintiffs pre- and post-judgment interest and costs;

C. Awarding Plaintiffs its reasonable attorneys' fees and costs; and

D. Awarding such other and further relief as the Court may deem proper.

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
December 9, 2015

Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By:   s/ Anthony L. Paccione
Anthony L. Paccione
anthony.paccione@kattenlaw.com
Allison M. Wuertz
allison.wuertz@kattenlaw.com

575 Madison Avenue
New York, New York 10022-2585
(212) 940-8800 (phone)
(212) 940-8776 (fax)

*Attorneys for Plaintiffs Kevin Heneghan, Ira Leventhal, Lookout Dove Partners LP, and Catherine Heneghan Revocable Trust*